# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:17-cr-00124-7 |
| | ) | Chief Judge Crenshaw |
| DECARLOS TITINGTON | ) | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Decarlos Titington's Motion to Suppress (Doc. No. 577), to which the Government has responded in opposition (Doc. No. 677), and Titington has replied (Doc. No. 741). For the reasons that follow, the Motion will be denied.

## I.

The facts necessary to place the legal issues in context are not in dispute.[1] On February 15, 2015, Clarksville Police Department ("CPD") Sergeant Beau Skinner and Officer Castin Lanham responded to a car-tree accident at the intersection of Walnut Street and Providence Boulevard in Clarksville, Tennessee. Upon arrival, Sgt. Skinner found Titington unconscious in the driver's seat with the vehicle running and in drive. Sgt. Skinner went to the passenger side of the vehicle, opened the door, and placed the transmission in park. In so doing, he observed a baggie containing a "white, powdery substance" sitting on the passenger seat. (Doc. No. 578-1 at 2). Meanwhile, Officer Lanham was on the other side of the vehicle attempting to wake Titington. In the process, he observed a Glock 19, 9 mm handgun on the driver's side floorboard of the vehicle. The handgun was loaded, and had 17 rounds in the magazine. With those discoveries, Sgt. Skinner contacted

---

[1] This is not to say that Titington admits to the facts contained in the police reports or the allegations made in a subsequent application for a search warrant. Rather, he agrees to these facts solely for the purpose of resolving the Motion to Suppress.

1

Agent Rodney Lockerman, the on-duty drug officer for the CPD, who informed Sgt. Skinner that he was familiar with Titington. Agent Lockerman proceeded to the accident scene.

Montgomery County medical personnel also went to the scene and began administering care to Titington. After being placed in an ambulance for transportation to Gateway Hospital for additional treatment, Titington was informed by Sgt. Skinner that he was under arrest, and that he (Sgt. Skinner) had been informed that there was a probation violation warrant on file. Titington began to empty his pockets, but was told to stop until an evidence envelope could be retrieved. Titington then placed his personal belongings into the envelope, including a Huawei Tracfone, IMEI 864705020364385 ("Tracfone").

Eleven days after the accident, Agent Lockerman sought a search warrant for the Tracfone. Based upon an accompanying affidavit (the details of which are discussed below), Judge L. Raymond Grimes of the Montgomery County General Sessions Court issued a search warrant. A subsequent search of the Tracfone's contents revealed text messages that allegedly used coded language relating to drug trafficking. It is those text messages and other contents of the Tracfone that Titington seeks to suppress.

## II.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Although "this fundamental right is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer," there are "exceptions to the general rule that a warrant must be secured before a search is undertaken." California v. Carney, 471 U.S. 386, 390 (1985). One such exception is that of a search incident to arrest, which the Supreme Court in

Chimel v. California described as follows:

> When an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated. In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction. . . . There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence."

395 U.S. 752, 762-763 (1969). Four years later, in United States v. Robinson, 414 U.S. 218, 234 (1973) the Supreme Court examined how the search-incident-to-arrest exception applies to searches of the person and reiterated Chimel's principle that "[t]he justification or reason for the authority to search incident to a lawful arrest rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person for later use at trial." Id. at 234. The Court went on to observe:

> The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification.

Id. at 235.

The intersection between searches incident to arrest and cell phones was at the heart of the Supreme Court decision in Riley v. California, 134 S. Ct. 2473, 2482 (2014), a case on which Titington heavily relies. That case, while resolving a split of circuit authority, is of little assistance here, however, because it related to whether the data in a cell-phone could be searched without a warrant. The Supreme Court wrote:

3

> Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans "the privacies of life." . . . The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought. Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant.

Id. at 2494 (citation omitted). This does not mean, however, that a cell phone cannot be seized as an incident to arrest, a point made clear by the statement in Riley that "our holding, of course, is not that the information on a cell phone is immune from search; it is instead that a warrant is generally required before such a search, *even when a cell phone is seized incident to arrest."* Id. at 2493 (emphasis added).

Without question, cell phones are ubiquitous nowadays. Indeed "[t]here are 396 million cell phone service accounts in the United States – for a Nation of 326 million people." Carpenter v. United States, 138 S. Ct. 2206, 2211, 201 L. Ed. 2d 507 (2018). But (1) Titington's envisioned parade of horribles involving "an entire category of personal property [that would be] left without any Constitutional protection against seizure" because "practically everyone either owns or has access to a cell phone in the United States," (Doc. No. 578 at 3), and (2) his reliance on Riley's observation that "[i]t would be a particularly inexperienced or unimaginative law enforcement officer who could not come up with several reasons to suppose evidence of just about any crime could be found on a cell phone," ignores the realities of this case. Officers were dispatched to a scene involving a running car crashed into a tree with suspected cocaine on the passenger seat, and a loaded Glock on the floorboard under an unconscious driver who, as it turns out, had been arrested on seven prior occasions for possession with intent to resell narcotic drugs.

The underlying purpose for the search incident to arrest exception to the warrant requirement

are "protecting arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might conceal or destroy." Arizona v. Gant, 556 U.S. 332, 339 (2009). The standard is not whether a casual bystander would deem the evidence incriminating, but whether it is "immediately apparent to the police that they have evidence before them." Coolidge v. New Hampshire, 403 U.S. 443, 466 (1971). Not to put too fine a point on it but, "'[r]eminiscent of the infamous bank robber, Willie Sutton's, reply when asked why he robbed banks ('[b]ecause that's where the money is'), the business of illegal drug commerce is conducted on cellphones." United States v. Hall, 603 F. Supp. 2d 1308, 1313 (D. Colo. 2009) ; see also, United States v. Hammett, 555 F. App'x 108, 110 (2d Cir. 2014) (noting that defendant was also found with a digital scale and two cell phones, "which are tools that drug dealers often possess"); United States v. Portalla, 496 F.3d 23, 27 (1st Cir. 2007) (stating that cell phones were "essential tools" of defendants' drug trade); United States v. Hernandez, 17 F. App'x 464, 467 (7th Cir. 2001) (identifying pagers and cell phones as tools of the drug trade); United States v. Hernandez-Dominguez, 1 F. App'x 827, 832 (10th Cir. 2001) ("Pagers and cell phones, again, while not dispositive, may be indicative of illegal activity because they are known tools of the drug trade.").

CPD officers did not err in seizing the Tracfone as a part of the search incident to arrest of Titington.

**III.**

Complying with the holding of Riley, Agent Lockmore sought and received a search warrant. Nevertheless, Titington argues that the warrant should not have issued because probable cause was lacking, and the information was stale. The Court disagrees.

To enforce the requirement in the Fourth Amendment that people be secure from

5

unreasonable searches, the Amendment further provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "Probable cause is defined as 'reasonable grounds for belief, supported by less than *prima facie proof* but more than mere suspicion.'" United States v. King, 227 F.3d 732, 739 (6th Cir. 2000) (quoting United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990)). In determining whether probable case exists, a reviewing court "is limited to the information presented in the four corners of the affidavit." United States v. Coffee, 434 F.3d 887, 892 (6th Cir. 2006) (citation omitted).

In a supporting affidavit, Agent Lockerman, after recounting the events relating to the discoveries at the traffic accident, indicated that the white powdery substance field tested positive for cocaine and weighed 8.4 grams. He also indicated that a NCIC criminal history check revealed that Titington had been arrested five times in the past for possession for resale of schedule VI narcotics, and twice in the past for possession for resale of Schedule II narcotics. Agent Lockerman then averred:

- he has been a law enforcement officer for over seven years; he has been a narcotics agent for over two years; and he has participated in state and federal narcotics investigations, including investigations resulting in the execution of search warrants;

- he has attended the Regional Counterdrug Training Academy's Basic Narcotics Investigations, the Drug Enforcement Agency's Basic Narcotics Investigator School, and the Department of Homeland Security's Money Laundering and Asset Forfeiture Training; and

- as a result of his training and experience, he was "aware of the habits, characteristics, and practices of drug dealers, and that drug dealers: "commonly have in their possession[] firearms, including handguns"; use guns to "protect and secure their property, drugs [sic] and illegal profits from thieves"; "commonly use vague coded language when they communicate about a specific controlled substance which they are selling or distributing" ; "commonly use cellular phones to arrange narcotics transactions"; "commonly use cellular phones to take photographs and videos of

narcotics they have in their possession"; and "typically use [] cellular telephone[s] and/or other mobile devices that are capable of receiving and making telephone calls, sending and/or receiving text messages, to communicate and arrange the specific details of a drug transaction"; and that "these details typically include vague, coded and/or cryptic language, which typically include the prices for the controlled substances, locations and times of when these individuals want to meet, and the controlled substance that those individuals are selling and purchasing."

(Doc. No. 578-5 at 2-3).

"A magistrate's determination of probable cause is afforded great deference by the reviewing court," and "[c]onsequently a magistrate's decision to grant a search warrant should only be reversed if it was arbitrarily exercised." United States v. Greene, 250 F.3d 471, 478–79 (6th Cir. 2001) (citing United States v. Allen, 211 F.3d 970, 973 (6th Cir. 2001); United States v. Finch, 998 F.2d 349, 352 (6th Cir.1993)). Furthermore, "courts should review the sufficiency of the affidavit in a commonsense, rather than hypertechnical manner," and consider the "totality of the circumstances." Id.

Here, as Titington points out, the application for a search warrant contains boilerplate allegations, including "generalities regarding drug dealers and their assumed use of cellular phones in their trade." (Doc. No. 578 at 9). However, "'[t]he Fourth Amendment does not require an officer to reinvent the wheel with each search warrant application.'" United States v. Green, 572 F. App'x 438, 442 (6th Cir. 2014) (quoting United States v. Weaver, 99 F.3d 1372, 1378 (6th Cir. 1996)). Thus, "the fact that an affidavit contains some 'boilerplate' language is not per se problematic so long as the affidavit also contains sufficient "specificity' to satisfy probable cause." United States v. Moore, 661 F.3d 309, 316 (6th Cir. 2011). The specifics here are that a driver, who had been arrested seven times in the past for possession with intent to distribute, was found (albeit unconscious) with a loaded Glock and 8.4 grams of cocaine within his reach. Viewed "in a

commonsense fashion," United States v. Ware, 338 F.3d 476, 482 (6th Cir. 2003), it was reasonable to believe that the cell phone he had on his person was used to assist in the distribution of drugs.

Nor is the eleven day delay between the accident and the securing of the warrant fatal. See generally, United States v. Jeanetta, 533 F.3d 651, 655 (8th Cir. 2008) ("Standing alone, the fact the controlled buy was made two weeks before the warrant issued does not render the information in the application stale."); United States v. Ortiz, 143 F.3d 728, 732-33 (2d Cir. 1998) (citation omitted) ("In investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant [does] not necessarily make the information stale.").
While it is true that "[i]n the context of drug crimes, information goes stale very quickly 'because drugs are usually sold and consumed in a prompt fashion,'" United States v. Brooks, 594 F.3d 488, 493 (6th Cir. 2010) (citation omitted), "'[t]he function of a staleness test in the search warrant context is not to create an arbitrary time limitation within which discovered facts must be presented to a magistrate,'" United States v. Spikes, 158 F.3d 913, 923 (6th Cir. 1998) (citation omitted). Indeed, "even if a significant period of time elapsed, it is possible the magistrate judge may infer that a search would uncover evidence of wrongdoing." United States v. Pinson, 321 F.3d 558, 565 (6th Cir. 2003).

Such an inference could easily be drawn in this case because what is at issue is historical information on the cell phone, not whether a drug deal was in the works on February 15, 2015. That is, there could be evidence of a crime on the Tracfone, such as text messages regarding drug transactions, irrespective of whether any of the actual drugs referenced in those messages had been distributed or consumed by the time the warrant was sought.

8

## IV.

Even if the issuance of the warrant was in error, suppression of the evidence found on the Tracfone is not warranted. The Supreme Court has held that unlawfully obtained evidence should not be suppressed "when the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful." Davis v. United States, 564 U.S. 229, 238 (2011) (quoting United States v. Leon, 468 U.S. 897, 909 (1984)). Thus, "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield 'meaningful' deterrence, and culpable enough to be 'worth the price paid by the justice system.'" Id. at 240.

Under this good-faith exception, "[w]hen police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted in objectively reasonable reliance on the subsequently invalidated search warrant." Herring v. United States, 555 U.S. 135, 142 (2009). "The Supreme Court has identified at least four situations in which the government's reliance on a subsequently invalidated search warrant is objectively unreasonable: (1) where 'the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth'; (2) 'where the issuing magistrate wholly abandoned his [neutral and detached] judicial role'; (3) where the warrant is 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; and (4) where the warrant is so 'facially deficient . . . that the executing officers cannot reasonably presume it to be valid.'" United States v. Powell, 603 F. App'x 475, 477 (6th Cir. 2015) (quoting Leon, 46 U.S. at 923).

There is no suggestion here that Judge Grimes was misled, or that he abandoned his role of neutrality. With regard to facial deficiency and the alleged absence of probable cause, "[f]or an

9

officer's reliance on a warrant to have been reasonable, the application must have provided 'a minimally sufficient nexus between the illegal activity and the place to be searched.'" United States v. McCoy, 905 F.3d 409, 416 (6th Cir. 2018) (quoting United States v. Brown, 828 F.3d 375, 385 (6th Cir. 2016)). The affidavit need not establish a "'substantial basis,' only 'some connection, regardless of how remote it may have been – some modicum of evidence, however slight – between the criminal activity at issue and the place to be searched.'" Id. (quoting United States v. White, 874 F.3d 490, 495 (6th Cir. 2017)). Certainly there was "some connection" and "some modicum of evidence" that the Tracfone was used in furtherance of drug trafficking and for this reason the good faith exception applies.

**V.**

For the foregoing reasons, Titington's Motion to Suppress (Doc. No. 577) is **DENIED.**

IT IS SO ORDERED.

_____
Waverly D. Crenshaw, Jr.
Chief United States District Judge